# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 16, 2008 Session

## HOMER ALSON MADDIN, III v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2003-A-393     Steve Dozier, Judge**

---

**No. M2007-02708-CCA-R3-PC - Filed October 27, 2008**

---

The petitioner, Homer Alson Maddin, III, appeals the Davidson County Criminal Court's dismissal of his 2007 petition for post-conviction relief in which he had challenged his four 2004 jury-imposed convictions of aggravated rape. This court affirmed the convictions on November 1, 2005. *See State v. Homer Alson Maddin, III*, No. M2004-02298-CCA-R3-CD (Tenn. Crim. App., Nashville, Nov. 1, 2005), *perm. app. denied* (Tenn. 2006). The petitioner's counseled petition raised various claims of the ineffective assistance of trial and appellate counsel. On appeal, the petitioner claims that his trial counsel was ineffective in neither communicating with the petitioner nor preparing him for trial, failing to explain the potential punishment the petitioner faced, failing to communicate a plea offer from the State, failing to investigate the case, failing to adequately cross-examine witnesses, failing to properly impeach State witnesses, and failing to object to improper prosecutorial argument and to the use of certain evidence. The petitioner also claims that his appellate counsel was ineffective in failing to raise certain issues on appeal. We affirm the order of the post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J.C. MCLIN, JJ., joined.

Brett M. Gipson, Nashville, Tennessee, for the appellee, Homer Alson Maddin, III.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Amy Eisenbeck, Assistant District Attorney General, for the appellant, State of Tennessee.

## OPINION

The facts underlying the petitioner's convictions were reviewed by this court in the petitioner's direct appeal. The evidence at trial showed that the victim, who was 19 years old at the time of the offenses, had known the petitioner for a long time and had dated him briefly in the past. The victim called the petitioner and asked him to help her get some "pills." *Homer Alson Maddin,*

*III*, slip op. at 2. To accomplish this, the victim followed the petitioner to his father's house, where the petitioner made some telephone calls to locate drugs. Ultimately, the victim took the petitioner to his mother's house. *Id.*, slip op. at 2.

> According to the victim, once they entered the apartment, the [petitioner] had a brief argument with his mother, then ushered the victim into a bedroom and left her alone. When the [petitioner] returned to the bedroom, he "closed the door and got extremely close," trying to kiss her and asking her to have sex with him. The victim testified that she refused and reminded the [petitioner] that she had a boyfriend. The victim claimed that she tried to leave, and the [petitioner] threw her on the bed, put a knife to her throat and told her "not [to] make any noises" because she did not "wanna get hurt."
>
> The victim explained that the [petitioner] then removed her shorts, "used his tongue" on her "private area" then forced her to "have sex with him." The victim testified that she was "silently crying the whole time" and begged him to leave. When the [petitioner] was finished, the victim put back on her shorts and got ready to leave. The [petitioner] then forced the victim to perform oral sex on him. After complying for a few seconds, the [petitioner] then penetrated the victim's vagina with his fingers and forced her to "have sex with him again." The victim testified that the [petitioner] ejaculated on both occasions and that the [petitioner] had a knife in his hand the entire time.
>
> The [petitioner's] version of the facts differed significantly from that offered by the victim. The [petitioner] maintained that the victim telephoned him looking for pills. The [petitioner] proposed that they meet at a local cinema so that the victim could follow him to his father's house. The victim . . . met the [petitioner] and followed him to his father's house. Once at the house, the [petitioner] made several phone calls, trying to locate some pills for the victim. According to the [petitioner], the victim offered him sex in exchange for pills. The three then left the party to go to the home of the [petitioner's] uncle to try to find drugs. Having no success, the three went to another location, again attempting to find pills or marijuana.
>
> The [petitioner] testified that during the . . . search[] for drugs, the victim was "hugging" on the [petitioner] and repeatedly offered to have sex with him if he could get her some pills. After

visiting several locations trying to find pills, [they] returned to the [petitioner's] father's house to make more phone calls. The [petitioner] claims that, at that time, the victim asked his father for pills and also offered him sex in exchange for drugs. In response to the actions of the victim, the [petitioner] testified that his niece, Julie Maddin, got into an argument with the victim and pushed her down, causing the victim to bleed from the neck and elbow.

After the altercation, the [petitioner] . . . asked the victim to take him back to his mother's apartment. When they arrived, the [petitioner] claimed that the victim came into the house with him and again offered to sleep with him if he could get her some pills. According to the [petitioner], the victim began "rubbing" on his leg and then "worked her way down" and "started rubbing" on his penis. The [petitioner] claimed that the victim unbuckled his pants, rubbed his penis and took off her clothes. The [petitioner] claimed that the victim was not only a willing participant, but also the aggressor during the encounter. The [petitioner] admitted that he and the victim had sex and that he ejaculated on the bed, then the victim asked him to roll over so that she could "get on top." At that point, the [petitioner] stated that he and the victim had sex for a second time and he ejaculated again on the bed. The [petitioner] claimed that the victim wanted to have sex for a third time, but the [petitioner] told her she could give him a "blow job." According to the [petitioner], the victim willingly complied.

The [petitioner] denied that there were any knives in the room. He stated that when he and the victim left the apartment, they were holding hands.

*Id.*, slip op. at 2-3.

In the post-conviction evidentiary hearing, the petitioner testified that he was a "slow learner" and had failed to earn a "GED" after four years of schooling at "River Bend." He testified that trial counsel visited him three or four times prior to trial and that, on those occasions, he told counsel that the victim's injuries and her bleeding resulted from a fight with the petitioner's niece and that a washcloth bearing the victim's bloodstains would have established the origin of the injuries and blood. The petitioner testified that when he arrived at his mother's house on the evening of the crimes, he made a number of telephone calls to "buddies."

The petitioner testified that counsel never explained the elements of aggravated rape and never told him that he had the option not to testify at trial. He testified that he "didn't want to testify" at trial because, he said, "I ain't educated well enough." Nevertheless, he believed that he

was compelled to testify. The petitioner denied that counsel informed him about the potential punishment he faced or that he could receive consecutive sentences. He testified that he "never heard [about] a plea." He testified that, had he known that he could receive consecutive 25-year sentences, he would have "took the fifteen." The petitioner testified that, to his knowledge, counsel did not visit the scene of the crimes.

The petitioner testified that he told counsel that he wanted his stepbrother, David Deckard, to testify at trial. He stated that he was unaware that a sentencing hearing would be held following the guilty verdicts and that counsel did not discuss with him any strategy for the sentencing hearing. He testified that he gave an uncounseled interview to the presentence investigator.

The petitioner denied that counsel told him that a sample of the victim's DNA had been found on a knife.

On cross-examination, the petitioner admitted that he was not charged with the offenses against the victim until a year after the events and that trial counsel was not engaged until that time. He admitted that he did not know what became of the washcloth. The petitioner claimed that independent proof of the telephone calls he made would have established that the victim was looking for drugs. He further admitted that David Deckard's proposed testimony would have duplicated other evidence heard by the jury. The petitioner testified that he would have taken a plea offer of twenty years to serve at 100 percent.

Metropolitan Nashville (Metro) police officer Warren Fleak testified in the evidentiary hearing that he investigated the crime scene and collected evidence including bed sheets, a bedspread, pillows, clothing, and two knives. He testified that the items were not used as evidence at trial and that the police department had destroyed them.

Metro detective Kent McAlister testified that he found no blood when he investigated the crime scene. The detective recalled that the petitioner's counsel requested that the knives be tested for the presence of biological material. He testified that the test revealed merely the presence of a substance of human origin.

Tennessee Bureau of Investigation forensic scientist Hunter Green testified that she tested the knives in question. She found no blood but found some other biological material of human origin.

The petitioner's trial counsel testified in the evidentiary hearing that he had been practicing law since 1980. He met with the petitioner at the jail four to six times and met with him twice after he was released on bond. Counsel testified that he was hired by the petitioner's father and worked with the father and other family members "in gathering evidence." Counsel testified that he was aware of the petitioner's learning disability and intelligence quotient score of 75. He testified that he told the petitioner what the prospective witnesses including David Deckard would say at trial. He told the petitioner about the test results on the knife.

-4-

Counsel testified that the petitioner's initial posture in the case was that he was not guilty and that no knife had been at the scene. Counsel testified that the discovery of the biological material on one of the knives damaged the defense's strategy of consensual sexual activity. Counsel could not recall whether he talked to the petitioner about his right not to testify, but he opined that the only way to advance the petitioner's defense in a "he said, she said" scenario was for him to testify. Otherwise, "the jury would not have heard his version of the events." Counsel testified that, "from day one," he and the petitioner operated from the assumption that the petitioner would testify as a means of advancing his theory of defense.

Counsel testified that he conveyed to the petitioner the State's 20-year plea offer; however, the petitioner was "pretty adamant" that he was not guilty.

Counsel agreed that he did not visit the crime scene but stated he saw no reason to do so because he had been engaged to represent the petitioner "long after the event." He testified that at trial he used a diagram of the apartment where the offense occurred.

Counsel testified that he did not subpoena David Deckard because, prior to trial, he met with Mr. Deckard and the petitioner's other family members who could serve as witnesses, all of whom agreed to be present at trial without the behest of a subpoena. When it developed that Mr. Deckard was unavailable for trial, counsel elected to proceed because the petitioner's father could provide the same information as could have been related by Mr. Deckard.

Counsel further testified that he met with the petitioner at least once prior to the sentencing hearing and obtained the petitioner's signature on a release for his mental health records.

Following the hearing, the post-conviction court entered extensive written findings of fact and conclusions of law. It accredited trial counsel's testimony over that of the petitioner and held that counsel had adequately met with the petitioner prior to trial, communicated the State's plea offer to the petitioner, properly investigated the case and prepared it for trial, and effectively cross-examined prosecution witnesses. The court determined that the petitioner failed to establish any deficiency in counsel's performance by failing to obtain the washcloth and/or the records of the petitioner's telephone calls on the night of the offenses. The court held that trial counsel did not trammel the petitioner's right to not testify at trial; the court stated that, as the trial court in the petitioner's case, it "always gives defendants the choice between testifying and not testifying." The court further held that the petitioner was not prejudiced by counsel's failure to further impeach the victim, by failing to call Mr. Deckard to testify, by failing to present – or otherwise object to – certain tangible evidence, and by failing to object to the prosecutor's final argument. Specifically, the court determined that the jury heard evidence of the victim's bad character and nevertheless accredited her testimony. Also, the court found that the proposed testimony of Mr. Deckard would have been cumulative to that of the petitioner's father. The post-conviction court determined that any liberties taken by the prosecutor during final argument were cured by the trial court's instructions. The post-conviction court also held that the petitioner had failed to establish the

ineffective assistance of appellate counsel. Based upon its findings and holdings, the post-conviction court denied relief.

The petitioner filed a timely notice of appeal from the court's order.

The post-conviction petitioner is obliged to establish his claims by clear and convincing evidence. *See* T.C.A. § 40-30-110(f) (2006). On appeal, the appellate court affords the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

The Sixth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution both require that a defendant in a criminal case receive effective assistance of counsel. *See Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975). When a defendant claims ineffective assistance of counsel, the standard applied by the courts of Tennessee is "[w]hether the advice given or the service rendered by the attorney [is] within the range of competence demanded by attorneys in criminal cases." *Summerlin v. State*, 607 S.W.2d 495, 496 (Tenn. Crim. App. 1980) (second alteration in original).

In *Strickland v. Washington*, the United States Supreme Court outlined the requirements necessary to demonstrate a violation of the Sixth Amendment right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). First, the petitioner must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and must demonstrate that counsel made errors so serious that he was not functioning as "counsel" guaranteed by the Constitution. *Id.* at 687, 104 S. Ct. at 2064. Second, the petitioner must show that counsel's performance prejudiced him and that errors were so serious as to deprive the petitioner of a fair trial, calling into question the reliability of the outcome. *Id.*; *Henley*, 960 S.W.2d at 579.

The reviewing court does not "second guess" tactical and strategic choices pertaining to defense matters and does not measure a defense attorney's representation by "20-20 hindsight." *Henley*, 960 S.W.2d at 579 (quoting *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)). Rather, a court reviewing counsel's performance should "eliminate the distorting effects of hindsight . . . [and] evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). On the other hand, "deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *Id.*

To establish prejudice, a party claiming ineffective assistance of counsel must prove a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.*

In the present case, nothing in the record countervails the post-conviction court's findings, and we affirm the denial of post-conviction relief. The petitioner's complaints about counsel's lack of communication and preparation were expressed only by him and were contradicted by counsel, whose testimony the post-conviction court accredited. The petitioner simply failed to establish other claims by clear and convincing evidence. For instance, the petitioner failed to show that he was prejudiced by the alleged inadequate chain of custody of the knife used by the State as evidence. Also, the petitioner failed to demonstrate prejudice from counsel's failure to advise him of his right not to testify at trial, especially in light of the post-conviction court's finding that, at trial, the court advised the petitioner of his options with respect to testifying. Also, the petitioner failed to establish ineffective assistance as a result of counsel's failing to obtain the washcloth, the call records for his parents' residential telephones, and/or further testing of the knife and of other materials from the crime scene. The petitioner's evidence did not belie the post-conviction court's determinations that trial counsel adequately cross-examined State witnesses and competently sought to impeach the victim.

In this vein, the petitioner failed to establish ineffective assistance as a result of counsel's failure to discover that the victim had been arrested for forgery and had confessed to that crime shortly before the petitioner's trial. The petitioner failed to show that counsel's failure to discover the arrest for – or the confession to – forgery was deficient performance or that the arrest itself provided a basis for impeachment.

Furthermore, the record does not show that the petitioner was prejudiced by his counsel's failure to object to the prosecutor's closing argument, especially in view of the post-conviction court's determination that its jury instructions adequately attenuated any liberties the prosecutor may have taken.

The petitioner complains about his appellate counsel related to that counsel's failure to raise on appeal the issue of trial counsel's lapses in preparing the petitioner for the sentencing hearing. We cannot sanction as ineffective assistance appellate counsel's failure to raise on direct appeal the issue of trial counsel's ineffectiveness during the sentencing proceedings. This court has repeatedly said that "[r]aising the issue of ineffective assistance of counsel on direct appeal is 'a practice fraught with peril.'" *See*, *e.g.*, *State v. Mosley*, 200 S.W.3d 624, 629 (Tenn. Crim. App. 2005) (quoting *State v. Sluder*, No. 1236, slip op. at 16 (Tenn. Crim. App., Knoxville, Mar. 14, 1990)). Even if the issue of trial counsel's performance in the sentencing proceedings had been raised as an issue of ineffective assistance in this post-conviction proceeding, we would fail to see that either deficient performance or prejudice was shown by a preponderance of the evidence.

All in all, the record supports the post-conviction court's findings and conclusions of law, and for that reason, we affirm that court's denial of post-conviction relief.

_____
JAMES CURWOOD WITT, JR., JUDGE